IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MAXISIQ, LLC, FORMERLY KNOWN AS IOMAXIS, LLC, D/B/A IOMAXIS,<br><br>_Plaintiff,_<br><br>v.<br><br>NICHOLAS HURYSH, JR.,<br><br>_Defendant._ | |
| NICHOLAS HURYSH, JR.<br><br>_Counter-Plaintiff,_<br><br>v.<br><br>MAXISIQ, LLC FORMERLY KNOWN AS IOMAXIS, LLC, D/B/A IOMAXIS,<br><br>_Counter-Defendant._ | Civil Action No: 8:22-cv-00314-JRR |
| NICHOLAS HURYSH, JR.<br><br>_Third-Party Plaintiff,_<br><br>v.<br><br>BRAD C. BUHR,<br><br>_Third-Party Defendant._ | |

## REDACTED MEMORANDUM OPINION AND ORDER

The court has before it the Motion to Enforce Settlement Agreement at ECF No. 207 filed by Defendant/Counter-Plaintiff/Third-Party Plaintiff Nicholas Hursyh, Jr., and all papers relating to same. The court convened a plenary evidentiary hearing on June 3, 2026. Based on the parties' filings on the Motion, the affidavits submitted by the parties,[1] documentary evidence entered at

---

[1] By stipulation, in support of their respective arguments in favor of and in opposition to the Motion, in lieu of live witness testimony, the parties offered sworn declarations (affidavits) of Third-Party Defendant Brad Buhr, Robert A. Burleson, William Griffin, III, all of Plaintiff/Counter-Defendant MAXISIQ, LLC ("MAXISIQ"), and Defendant/Counter-Plaintiff/Third-Party Plaintiff Nicholas Hurysh, Jr. (ECF No. 237-1.) As a result of their stipulation, the Motion for Protective Order at ECF No. 235 was voluntarily withdrawn. (_See_ order at ECF No. 236.) The phrase "MAXISIQ Parties" used herein refers jointly to Plaintiff/Counter-Defendant MAXISIQ, LLC, and Third-Party Defendant Brad Buhr. Further, throughout this case, the parties and the court have referred interchangeably to MAXISIQ and IOMAXIS to refer to the same entity; the court here uses the name MAXISIQ.

the hearing, as well as argument of counsel, the court finds as set forth below.

I.       **RELEVANT BACKGROUND**

For the sake of brevity and efficiency, the court dispenses with reciting a fulsome background of the parties' relationships and the procedural and substantive history of this case (and related cases).  As the record reflects, the parties' once apparently fruitful two-decade business and employment relationship devolved into litigation across several judicial venues within and without this district, persisting over several years with innumerable pleadings and motions, and—in all—bearing the unfortunate hallmarks of the crucible of litigation at its worst.

All of this looked like it was coming to a blessed end on Friday, January 30, 2026—the Friday before trial was set to begin Monday, February 2—when, after many fits and starts, the parties' efforts to reach global resolution appeared by all accounts to cross the finish line.  At 4:39 p.m., Aaron Nichols, co-counsel for Hurysh, emailed Travis Bustamante, co-counsel for MAXISIQ Parties as follows:

[INTENTIONALLY LEFT BLANK]

Travis – Thanks again for the calls.

Here are the material terms of the Parties' agreement:

1. ██████████ payable in four payments – payment schedule below.
2. Payable each year on March 31, with the first payment due on March 31, 2026.
3. Interest rate at ████ per annum on the outstanding balance (beginning to accrue on April 1, 2026).
4. Accrued interest payable on March 31, 2027, March 31, 2028, and March 31, 2029.
   1. NO penalty for early payoff.
5. Payment schedule, including accrued interest, as follows:
   1. **March 31, 2026 =** ██████████
   2. **March 31, 2027 =**
   3. **March 31, 2028 =**
   4. **March 31, 2029 =**
      1. *Note: this is the calculation we discussed on the phone – Let me know if it is consistent with your numbers.*
6. Five Insights will be a party to the settlement agreement.
   1. Standard terms on the agreement (attorneys' fees, acceleration in event of breach, etc.).
7. Mutual and full releases.
8. Release/dismissal of the 1099 lawsuit would require a formal letter from IOMAXIS/MAXISIQ (or it's accountant) that the two 1099s were issued in error and thus have been withdrawn (something demonstrating that Hurysh did not received such income and, therefore, does not owe taxes on the stated income).
9. Strict confidentiality.

We also agreed that we will cancel the trial for Monday and agreed that, if settlement goes sideways, we will try one consolidated trial on all remaining issues.

Please let me know if this reflects the parties' agreement.

I'm available to discuss.

Thanks,
Aaron

(ECF No. 209-1, sealed; Hurysh Hearing Ex. 1.)

At 4:59 p.m., Bustamante replied: "Yes. Looks right. We'll take a pen.[2] . . . Swing by the Pendry for a beer." (Ex. C, ECF No. 228-3 at p. 2.) The parties also agreed that because Magistrate Judge Quereshi (to whom the case was referred for settlement and other purposes) would let the undersigned know they had reached a settlement, the parties did not have to make

---

[2] The parties agreed counsel for MAXISIQ would take lead on drafting the longform settlement agreement. Further, reference in the parties' January 30 email correspondence to the "1099 lawsuit" is to Case No. 25-507-JRR.

the effort to reach out to chambers directly to request that trial be canceled.  As the parties expected,

that same day, Judge Quereshi advised the undersigned that the parties had settled and that a Rule

111 should be entered.  Thereafter, at 7:09 p.m. that evening, the court (the undersigned) emailed

all counsel:

> Good evening, counsel.  Congratulations on reaching a settlement. I have directed that a R. 111 order be docketed and, following that, an order canceling trial. I have requested that court staff docket the orders this evening. Once you see them come through via ECF, you need not appear on Monday.  Thank you for continuing to work diligently to resolve this case.
>
> Be well, and stay safe and warm.
>
> JRR

No attorney responded to that email or otherwise alerted the court that a settlement had not in fact

been reached, that a Rule 111 order should not be docketed, or that trial should not be canceled.

About 40 minutes later, at 7:51 p.m., Friday, January 30, 2026, a Rule 111 order was

docketed at ECF No. 203:

> This court has been advised by the parties that the above action has been settled, including all counterclaims, cross-claims, and third-party claims, if any. Accordingly, pursuant to Local Rule 111 it is ORDERED that:
>
> This action is hereby dismissed and each party is to bear its own costs unless otherwise agreed, in which event the costs shall be adjusted between the parties in accordance with their agreement. The entry of this order is without prejudice to the right of a party to move for good cause within 30 days to reopen this action if settlement is not consummated. If no party moves to reopen, the dismissal shall be with prejudice.[3]

---

[3] By email of Tuesday, February 3, 2026, counsel for MAXISIQ Parties confirmed to Judge Quereshi's chambers that a Rule 111 order should also be entered in the parties' related case (referred to as the "1099 lawsuit" in the January 30 email correspondence), Case No. 25-507-JRR, because "[t]he settlement reached in [Case No. 22-314-JRR] **does** extend to the related Tax/1099 case . . . and that case will be dismissed."  (Hurysh Hearing Ex. 5; also at ECF No. 229-2, Ex. B to Hurysh's reply in support of the Motion)(emphasis in original.)

Immediately thereafter, at 7:54 p.m., the court entered an order canceling the trial set to start Monday, February 2, 2026. (ECF No. 204.)  Again, at no time did any party express to any other party or to the court that the Rule 111 order should not have been issued.  No party notified the court at any time that, in fact, the case had not been settled as clearly set forth in the Rule 111 order at ECF No. 203; to the contrary, as set forth in footnote 3, *supra*, counsel for MAXISIQ Parties expressly confirmed to Judge Quereshi's chambers staff that both this action and the 1099 lawsuit had been settled.  Moreover, about a month after the court canceled trial and issued the Rule 111 order, on February 27, 2026, the parties filed a joint motion for extension of the deadline to move to reopen the case per Rule 111, explaining: "The Parties are diligently working to consummate the settlement, but the Parties require additional time to do so." (ECF No. 205.)  The court granted the joint motion and extended the Rule 111 deadline to March 16, 2026, to allow the parties more time to paper their deal. (ECF No. 206.)  In all, all parties (including MAXISIQ) expressly advised the court in several ways that this case and the 1099 lawsuit had been settled, and conducted themselves accordingly.

Notwithstanding the foregoing, on March 12, 2026, following complaints by counsel for Hurysh (communicated in emails among counsel) that the MAXISIQ Parties were dragging their feet in drafting, Hurysh filed the instant Motion.  Thereafter, the parties filed several joint requests to extend the Rule 111 order deadline, which were granted, and the court held in abeyance the response deadline to the Motion so the parties could focus on getting their settlement formally documented in a traditional, longform settlement agreement. (ECF Nos. 210-16, 218.)  Then, on April 22, 2026, after the parties engaged in additional conferences with Judge Quereshi regarding "two remaining points" (*see* order at ECF No. 220), the court directed that a response to the Motion be filed by May 1, 2026, with a reply to follow per the Local Rules. (ECF No. 226.)  The parties

filed timely papers and, as mentioned above, the court held an evidentiary hearing on the Motion on June 3, 2026.  The Motion is now ripe for ruling.

## II.   **APPLICABLE LAW**

A motion to enforce a settlement agreement "draws on standard contract principles . . . [and] district courts have inherent authority, deriving from their equity power, to enforce settlement agreements." *Hensley v. Alcon Lab'ys, Inc.*, 277 F.3d 535, 540 (4th Cir. 2002).  "[T]o exercise its inherent power to enforce a settlement agreement, a district court (1) must find that the parties reached a complete agreement and (2) must be able to determine its terms and conditions.  If there is a factual dispute over the existence of an agreement, over the authority of attorneys to enter into the agreement, or over the agreement's terms, the district court may not enforce a settlement agreement *summarily.*  Instead, when such factual disputes arise, the court must 'conduct a plenary evidentiary hearing in order to resolve that dispute,' and make findings on the issues in dispute.  If a district court concludes that no settlement agreement was reached or that agreement was not reached on all the material terms, then it must deny enforcement." *Hensley*, 277 F.3d at 540–42 (internal citations omitted) (emphasis in original); *see also Davis v. Wash. Metro. Area Transit Auth.*, Case No. TJS 23-1171, 2023 WL 7410855, at *3–5 (D. Md. Nov. 8, 2023) (citing and relying on *Hensley* and noting that public policy favors enforcement of settlement agreements).

As explained by the Fourth Circuit in *Topiwala v. Wessell*:

> When considering a motion to enforce a settlement agreement, the district court applies standard contract principles. *Bradley v. Am. Household Inc.,* 378 F.3d 373, 380 (4th Cir. 2004). Under Maryland law, a settlement agreement exists if the parties intended to be bound and the agreement's terms are sufficiently definite. *See Cochran v. Norkunas,* 398 Md. 1, 919 A.2d 700, 708 (2007). In determining whether the parties intended to be bound, Maryland law utilizes an objective approach. *Id.* at 709. Under this approach, the court asks

what a reasonably prudent person in the parties' position would have understood to be the meaning of the agreement. *Id.* at 710. Where the language of the agreement is unambiguous, Maryland's objective approach requires the court to give effect to the agreement's plain meaning, and not to inquire into what the parties may have subjectively intended. *See id.* at 709. As for definiteness, the parties may be silent with respect to relevant but nonessential terms, and this will not destroy a settlement agreement's enforceability. *See id.* at 708.

A settlement agreement may be enforceable notwithstanding the fact that it is not yet consummated. *See Hensley v. Alcon Labs., Inc.,* 277 F.3d 535, 542 (4th Cir. 2002) (contrasting consummating a settlement agreement from reaching one). Moreover, the fact that a party has "second thoughts" about the agreement's results does not render the agreement unenforceable. *Id.* at 540.

509 Fed. App'x. 184, 186 (4th Cir. 2013).

Regarding having "second thoughts" about a settlement agreement, the *Hensley* court (cited by *Topiwala, supra*) specifically explained: "'having second thoughts about the results of a valid settlement agreement does not justify setting aside an otherwise valid agreement,' and the fact that the agreement is not in writing does not render it unenforceable." 277 F.3d at 540 (first quoting *Young v. FDIC,* 103 F.3d 1180, 1195 (4th Cir.1997), then citing *Alexander v. Industries of the Blind, Inc.,* 901 F.2d 40, 41 (4th Cir.1990)).

Relevant here, the absence of various terms from a purported settlement agreement does not preclude enforcement where the absent terms, although relevant, are nonessential. *Topiwala,* 509 Fed. App'x. at 186 (holding "a venue provision, a liquidated damages clause, and the precise timing of some transfers" as relevant but nonessential terms the absence of which do not preclude enforcement where the document movant relied upon as the enforceable settlement agreement "contained all essential terms of settlement").

Also relevant here is the extent and limit of an attorney's authority to settle a case on behalf of his client. An attorney is not empowered to enlarge the scope of his authority to bind his client

7

by virtue of the attorney's representations to third parties. *Homa v. Friendly Mobile Manor, Inc.*, 93 Md. App. 337 (1992); *Fox Grocery Co. v. Mineral Labs, Inc.,* 960 F.2d 146 (4th Cir. 1992) (unpublished table decision); *see Auvil v. Grafton Home, Inc.*, 92 F.3d 226, 230 (4th Cir. 1996)(explaining that "[i]t is generally accepted that when a client retains an attorney to represent him in litigation, absent an express agreement to the contrary, the attorney has *implied* authority to conduct the litigation and to negotiate its resolution. But the '[s]ubstantive decisions of whether to bring suit, to dismiss suit, or to settle are not by implication ones that the attorney is authorized to make'")(emphasis in original)(quoting *Schafer v. Barrier Island Station, Inc.,* 946 F.2d 1075, 1079 (4th Cir.1991)).

As explained by the Maryland Appellate Court:

> An "attorney's authority to settle claims is a question of fact." *Scamardella v. Illiano*, 126 Md. App. 76, 84, 727 A.2d 421 (1999). "Whether or not there was an agreement of settlement, and if so, what were its terms[,] are, upon conflicting evidence, questions for the trier of fact" as well. *Grain Dealers Mut. Ins. v. Van Buskirk*, 241 Md. 58, 70, 215 A.2d 467 (1965); *see also Eisenberg v. AirConditioning, Inc.*, 225 Md. 324, 331-32, 170 A.2d 743 (1961).

> .     .     .

> "The relationship of lawyer to client is generally one of agency." *In re Alijah Q.*, 195 Md. App. 491, 520, 7 A.3d 106 (2010) (citing *Salisbury Beauty Sch. v. State Bd. of Cosmetologists*, 268 Md. 32, 45, 300 A.2d 367 (1973)). "The actions of an attorney within the scope of his employment are binding upon his client under the ordinary principles of agency." *Salisbury Beauty Sch.*, 268 Md. at 45, 300 A.2d 367. "There is a *prima facie* presumption in Maryland 'that an attorney has authority to bind his client by his actions relating to the conduct of litigation.'" *Mitchell Props. v. Real Estate Title Co.*, 62 Md. App. 473, 483, 490 A.2d 271 (1985) (quoting *Kinkaid v. Cessna*, 49 Md. App. 18, 22, 430 A.2d 88 (1981)).

> An attorney's implied authority does not, however, extend to settlement. "[A]n attorney by virtue of the attorney-client relationship does not have implied authority to settle his client's

claim. There must exist express authority to the attorney to authorize him to settle the client's case." *Accrocco v. Splawn*, 264 Md. 527, 533, 287 A.2d 275 (1972); *see also Kinkaid*, 49 Md. App. at 22, 430 A.2d 88 ("[A]n attorney has no implied authority to compromise his client's claim. Express authority is required." (internal citations omitted)). It is the burden of "the party seeking to enforce a settlement order [to] prove: (1) that the other party's counsel acted with the authority of his client; and (2) that such authority expressly extended to the settlement of the claim." *Mitchell Props.*, 62 Md. App. at 483, 490 A.2d 271.

*4900 Park Heights Ave. LLC v. Cromwell Retail 1, LLC,* 246 Md. App. 1, 18, 20–21 (2020).

Further, where the court makes an evidentiary finding that a client (as principal) did provide express authority to his attorney (as agent) to settle a case, the court need not determine or conclude that the client and attorney "shared the same subjective understanding of the agreed terms," because "[s]uch a rule would impede settlements and the efficient operation of the courts; permit much mischief by parties inclined to back out of agreed settlements; and thereby subvert the State's deeply rooted public policy encouraging settlements." *Id.* at 25–26 (collecting cases).

## III.    ANALYSIS

The email of January 30, 2026, begins: "Travis - Thanks  again for all the calls.  Here are the material terms of the Parties' agreement."  Nichols then goes on to itemize what the parties agreed to, including: the total settlement sum, installment payment dates and amounts, applicable annual interest on the outstanding settlement sum, no penalty for early payoff, inclusion of third party entity Five Insights as a party to the agreement, mutual full releases, conditions of dismissal of the related "1099 lawsuit," acceleration of payment of the settlement sum in the event of breach, an attorneys' fees provision tied to breach of the settlement agreement, confidentiality, and other "standard terms."

Hurysh takes the position that the parties agreed upon all material terms of settlement through this email exchange on January 30, 2026.  Notwithstanding the fact that Bustamente: 1)

9

responded "yes" to Nichols' request that Bustamante let him know "if this reflects the parties agreement," 2) offered to put together the first draft of the agreement, 3) agreed that Judge Quereshi could "break the news" that trial could be canceled, and 4) invited Nichols out for a celebratory beer—MAXISIQ Parties now take the position that the January 30 email does not reflect an enforceable settlement agreement despite the fact that they advised the court (several times) settlement had been reached.

Specifically, MAXISIQ Parties argue: 1) the absence of an enforceable agreement is demonstrated by the fact that Nichols closed his email to Bustamante as follows: "We also agreed that we will cancel the trial for Monday and agreed that, if settlement goes sideways, we will try one consolidated trial on all remaining issues.";[4] 2) the parties' exchanged settlement agreement drafts include various terms not expressly itemized in the January 30 email exchange and the parties remain in dispute over some of these items; and 3) the decisionmaker for MAXISIQ, Third-Party Defendant Brad Buhr, did not authorize its attorney to agree on acceleration of the settlement amount as a penalty for breach of the parties' agreement.  The court addresses each in turn below.

### A.    ". . . if settlement goes sideways, we will try one consolidated trial . . . ."

MAXISIQ asserts because the parties contemplated a consolidated trial if settlement went "sideways," the January 30 email does not reflect a settlement, but rather a "partial settlement" and "contemporaneous confirmation that they did not have a complete agreement."  MAXISIQ adds, "[i]f it was a complete agreement, there would be no way for settlement to 'go[] sideways.'" This is unpersuasive for a several reasons.

First, that same afternoon (Friday, January 30), the parties reached out to Judge Quereshi to let him know they had settled, trial should be canceled, and a Rule 111 order entered.  That

---

[4] Trial in this matter had been bifurcated.

Tuesday, February 3, counsel for MAXISIQ confirmed in writing to Judge Quereshi's chambers that "the settlement reached" in Case No. 22-314 "**does** extend to the related Tax/1099 case." (Hurysh Hearing Ex. 5; emphasis in original.)

Second, Rule 111 precisely contemplates that a settlement might go sideways, *i.e.*, that parties might not be able to consummate their agreement in writing, thus entitling a party to seek to re-open the case. The Rule provides:

> When the Court has been notified by counsel that a case has been settled, the Court may enter an order dismissing the case and providing for the payment of costs. Such an order of dismissal shall be without prejudice to the right of a party to move for good cause to reopen the case within a time set by the Court if the settlement is not consummated. Alternatively, the Court, upon being notified by counsel that a case has been settled, may require counsel to submit within sixty (60) days a proposed order providing for settlement, in default of which the Court may enter such judgment or other order as may be deemed appropriate. An order entered pursuant to this Rule means that the entire case, including all claims, counterclaims, cross-claims, third-party claims, and claims for attorneys' fees and costs has been settled, unless otherwise stated in the order.

Local Rule 111 (D. Md. 2025).

Thus the rules contemplate, as did counsel, that challenges ahead might result in the parties not consummating their agreement in a long-form document, and that—in that event—the court may find cause to reopen the case. MAXISIQ's argument that acknowledging that a deal might fall apart (not be consummated) means that no deal was ever reached is wrong-headed—which MAXISIQ seemingly acknowledges elsewhere in its opposition: "In consideration for canceling the February 2, 2026 jury trial, MAXISIQ agreed to a single consolidated trial of all remaining issues if the settlement could not be consummated." (ECF No. 228 at p. 8.) Moreover, MAXISIQ's argument here fails to explain counsel's email to Judge Quereshi's chambers on Tuesday, February 3 expressly confirming that settlement had been reached and a Rule 111 order

should be entered in both actions; and, as set forth in Rule 111, entry of a Rule 111 order "means that the entire case . . . has been settled[.]"

Third, while not dispositive, it stands to reason that Bustamante's invitation to "swing by the Pendry for a beer" was an invitation to toast resolution of the parties' disputes.

### B.    The January 30 Email Leaves Open Terms

Next, MAXISIQ asserts that the January 30 email "leaves open at least two terms for further negotiation and agreement" such that the email is not an enforceable agreement. Specifically, MAXISIQ refers to Nichols' itemization of "[s]tandard terms on the agreement (attorneys' fees, acceleration in event of breach, etc.)."  MAXISIQ asserts that use of the phrase "etcetera"[5] indicates that additional terms would be included in the parties' written consummation of their settlement; and, to that end, each side added various terms in their respective drafts and counter-drafts, including choice of law, venue, as well as MAXISIQ's proposed indemnification, non-disparagement, liquidated damages, rescission upon breach, and cure period terms; and Hurysh's proposed acceleration on sale of MAXISIQ, notification of sale of MAXISIQ, and integration clause.[6]   MAXISIQ takes this a step further by asserting that these additional terms are material, and "etc." was a placeholder for these unmentioned material terms and, therefore, the email does not represent an enforceable settlement agreement.  This is not persuasive.

It bears repeating that MAXISIQ expressly agreed on January 30 that the Nichols email contained "the material terms of the Parties' settlement agreement."  Moreover, Nichols' use of

---

[5] Black's Law Dictionary defines "et cetera" or "etcetera" to mean "and others" and explains "[t]he term usually indicates additional, unspecified items in a series." *ET CETERA*, Black's Law Dictionary (12th ed. 2024).
[6] MAXISIQ asserts that Hurysh's proposed additional terms include acceleration of the settlement sum on breach of the agreement (ECF No. 228 at p. 15), but that is expressly listed in the January 30 email, which Bustamante agreed (by return email that afternoon) reflects the material terms of the parties' settlement.  (*See also* Hurysh Hearing Ex. 3 at p. 22, co-counsel for Hurysh, Steven Tiller, asserting to Bustamante via redline draft mark-up that acceleration on breach was "specifically agreed to . . . and is expressly identified in the email exchange . . . on January 30 confirming the parties' agreement to the material settlement terms." Bustamante responds via redlined comment: "We are getting client approval but OK to include acceleration;" Tiller replies, "Agreed.")

the catch-all "etc." caps the itemized list of what the parties' agreed were "standard terms."  While the court acknowledges that a term lawyers commonly refer to as "standard" may still be subjectively material in a particular agreement, MAXISIQ's position that what "etc." captures here are unmentioned material terms simply does not bear scrutiny on the weight of the record before the court.

The court agrees that acceleration on, and notification of, sale of MAXISIQ are material (and not standard or immaterial) terms, and while Hurysh was free to propose these terms in the throes of the post-January 30 drafts, he has no right to demand they be included in the written form of the parties' agreement.  But this is of no moment, as counsel for Hurysh confirmed to the court at the hearing that he yields on these terms should the court find they were not part of the January 30 agreement and are material.  Putting those aside, the balance of these terms may be relevant, but they are not nonessential, and as such, do not pose a barrier to enforcement. *Topiwala v. Wessell*, 509 Fed. App'x. 184, 186 (4th Cir. 2013).

In any event, several of the additional (etc.) terms MAXISIQ relies on to argue that the January 30 email is not an agreement on all material terms were, in fact, later successfully negotiated by the parties in whole or in part.  For example, Bustamante agreed to remove the non-disparagement clause from the working draft after Tiller asked that it be deleted.  (Hurysh Hearing Ex. 3 at p. 24.)  And Tiller agreed to an indemnification clause after initially asking that Bustamante not include one.  (*Id*.)  Tiller also agreed to a cure period after initially challenging its inclusion—a term Bustamante refers to as a "standard term."  So, not only were many of these terms apparently successfully negotiated, counsel for MAXISIQ's description of a cure period as standard and its absence from the January 30 email (except perhaps by operation of "etc.") is at odds with MAXISIQ's assertion here as to its materiality such that its omission from the January

30 email exchange indicates the parties did not settle the case.

MAXISIQ's position is also at odds with its counsel's reference to the January 30 email exchange as reflective of the four corners of the parties' settlement agreement during the parties' subsequent draft exchanges and mark-ups.  Specifically, the court notes Bustamante's repeated reliance on the January 30 email exchange to protest some of Tiller's additional term proposals. In counsel's redline mark-up of the working draft, Bustamante pushed back on Tiller's proposed term regarding attribution of the settlement sum: "This was not part of the January 30 email and we do not understand why it is necessary for the agreement."  In response, Tiller appropriately yielded: "Mr. Hurysh will withdraw his demand that this provision be included in the final agreement."  (Hurysh Hearing Ex. 3 at p. 21, ¶ 1.)  Bustamante also challenged Tiller's proposal that his client receive notice on the sale of MAXISIQ: "This is not part of the January 30 email . . . ."  *Id.* at p. 22, ¶ 5.  And when questioning why the draft did not address the 1099 lawsuit in accordance with the January 30 email, Tiller wrote: "The terms of the settlement expressly agreed to on January 30th specifically called for [an IRS] letter to address both the 2023 and 2024 [1099] forms."  Bustamante responded: "Should be OK.  We stand by original agreement to include 2023 and 2024."  *Id*. at p. 23, ¶ 5.

During the hearing on the Motion, counsel for MAXISIQ invoked cannons of construction to argue that the parties use of the phrase "etc." indicates the parties left open material terms such that the January 30 email exchange is not an enforceable settlement agreement.  Counsel argued:

> "*Et cetera* is very definite and it means we're going to include more
> . . . . where a contract uses an incorporative word like disaster and
> then says, including, hurricanes, tornadoes, COVID, whatever it is,
> courts will say if you use including, those specific things limit the
> generality of the bigger word. But if you include, including but not
> limited to, then you default to the generality of the bigger word and
> that's what we have here, which is standard terms, we've listed two,
> they're being included and then we list *et cetera*, which means not

limited to, that the parties contemplated agreeing to other standard terms, which we think include cure period, rescission, venue provision that we would agree on."

Against the backdrop of 1) Bustamante's express confirmation that Nichols' January 30 email included all the material terms[7] and offer to draft, 2) counsel for MAXISIQ's January 30 communication with Judge Quereshi that the case was settled and trial could be canceled, 3) MAXISIQ's failure to raise any red flags following the undersigned's email confirming the case had settled, trial was canceled, and a Rule 111 order was forthcoming, and 4) counsel for MAXISIQ's February 3 communication to Judge Quereshi's law clerk that both this action and the 1099 lawsuit were settled and so a Rule 111 order should also be entered in that case—argument that no settlement agreement was entered because a list of "standard terms" concluded with the word "etc." is entirely unpersuasive.

### 1. The 1099 Lawsuit

MAXISIQ also asserts that "another open term" pertains to resolution of what the January 30 email refers to as the "1099 lawsuit"—Case No. 25-507-JRR, in which Hurysh sued MAXISIQ for unjust enrichment, fraud, and violation of the Internal Revenue Code in connection with alleged wrongful issuance of Forms 1099 for tax years 2023 and 2024.  On this point, the January 30 email provides: "Release/dismissal of the 1099 lawsuit would require a formal letter from IOMAXIS/MAXISIQ . . . that the two 1099s were issued in error and thus have been withdrawn (something demonstrating that Hurysh did not receive[] such income and, therefore, does not owe taxes on the stated income)."  MAXISIQ urges that the email "captures only what Hurysh 'would require,' not what MAXISIQ agreed to provide."  (ECF No. 228 at pp. 10, 15.)

This is unpersuasive.  First, Bustamante confirmed to Nichols in the January 30 exchange

---

[7] The court simply does not find it credible that after years of tortuous, costly litigation, MAXISIQ would cavalierly rely on "etc." to secure terms it felt were material to settlement.

that this was a "material term[] of the Parties' agreement." (ECF No. 209-1, sealed; Hurysh Hearing Ex. 1). Second, during the draft mark-up exchange, Bustamante unequivocally assured Tiller that his client "stand[s] by [the] original agreement to include 2023 and 2024." (Hurysh Hearing Ex. 3 at p. 23, ¶ 5). Third, use of the phrase "would" when read in this context is either conditional (*i.e.*, Hurysh will dismiss the 1099 lawsuit if MAXISIQ provides the letters; Hurysh would agree to dismiss the action in exchange for the letters; or Hurysh will dismiss the action if MAXISIQ would provide the letters) or is use of a modal verb to render more polite or soften a demand or request (*e.g.*, when a customer tells a waiter, "I would like the ham sandwich" instead of "I want the ham sandwich" or "give me a ham sandwich."). The 1099 lawsuit was not an open term. To the contrary, it was set forth clearly as a material term of the parties' agreement to which MAXISIQ agreed and then conducted itself accordingly thereafter.

### C. Counsel for MAXISIQ Lacked Authority to Agree to Acceleration on Breach

Last, MAXISIQ argues its counsel did not have authority to bind MAXISIQ to agreement to accelerate payment of the settlement sum on breach. Relevant here is the Declaration of Brad Buhr (ECF 237-1) who had final settlement decision-making authority for MAXISIQ (and Five Insights). Mr. Buhr attests that he had several phone conversations with counsel on January 30, 2026, about settlement proposals; that day, he authorized counsel to agree to Hurysh's proposed settlement sum and related payment terms as part of a global resolution, as well as other terms regarding no penalty on accelerated payoff, and inclusion of Five Insights as a party to the agreement. *Id.* at ¶¶ 8-11. Importantly, Buhr further attests: "I authorized Mr. Chesson[8] to include other terms, without any specific restriction, that he believed prudent. . . . On January 30, I did not understand that a final settlement would include a separate penalty provision that required

---

[8] Co-counsel for MAXISIQ Parties, Benjamin S. Chesson.

16

MAXISIQ to pay the total settlement sum in the 'event of breach.'" *Id*. ¶¶ 12, 14.

As set forth above, it is axiomatic that an attorney is not empowered to enlarge the scope of his authority to bind his client by virtue of the attorney's representations to third parties. *Homa v. Friendly Mobile Manor, Inc.*, 93 Md. App. 337 (1992); *Fox Grocery Co. v. Mineral Labs, Inc.,* 960 F.2d 146 (4th Cir. 1992)(unpublished table decision); *see Auvil v. Grafton Home, Inc*., 92 F.3d 226, 230 (4th Cir. 1996), *supra*. Here, however, based on the evidence, the courts finds counsel of record for MAXISIQ Parties had authority to bind MAXISIQ to a settlement agreement with Hurysh that includes the disputed acceleration on breach provision; and that Hurysh has satisfied his burden to prove that counsel for MAXISIQ acted with its authority and that such authority expressly extended to the settlement of this action (including acceleration on breach). *4900 Park Heights Avenue LLC v. Cromwell Retail 1, LLC,* 246 Md. App. 1, 18, 20–21 (2020).

MAXISIQ provided express and broad authority to its counsel to settle this action on whatever terms they deemed prudent in the exercise of their professional, fiduciary judgment; it matters not that MAXISIQ may not have shared the same subjective understanding with its attorneys as to what that might entail vis-à-vis potential terms. *Id.* at 25–26 (collecting cases).

Further, while not dispositive, the court notes the considerable volume of post-January 30 communications between and among counsel—across several months—regarding draft agreements and the like in which no mention was made or concern raised that the deal wasn't going to be done because counsel lacked authority to agree to the terms set forth in the January 30 email. Indeed, MAXISIQ raised this issue for the first time only in opposition to the Motion— filed on May 15, 2026. Such an extensive delay after months of communications with counsel— not to mention joint requests to extend the Rule 111 deadline on grounds that the parties continued to work on papering the deal—raises considerable credibility concerns for the court. Given the

countless opportunities where it would have been appropriate and important to communicate (discreetly or otherwise) a problem to opposing counsel or the court, such delay suggests second thoughts or an internal attorney-client matter neither of which impugns the deal itself.

IV.    **CONCLUSION**

For the reasons set forth herein, the court finds the parties reached a complete agreement and its terms are clearly delineated in the January 30 email.  Therefore, the Motion shall be, and is hereby GRANTED as follows: the parties' settlement shall be on the material terms set forth in the email exchange of January 30, 2026, and the parties shall file a notice of settlement within 45 days.  The parties shall contact Judge Quereshi's chambers within two business days of this order to schedule a conference to resolve their drafting impasse, and to seek resolution regarding the installment payment the parties agreed was due March 31, 2026.  Any relief not expressly granted herein is DENIED.[9]

It is so ORDERED.

June 25, 2026                                                                    /S/

                                                           _____
Julie R. Rubin
United States District Judge

---

[9] Through the Motion, Hurysh requests the court find the January 30 email exchange is an enforceable settlement agreement and defines the term "Settlement Agreement" to mean that email exchange.  (ECF No. 209 at p. 1.)  In footnote 5 on the penultimate page of the Motion, Hurysh "respectfully requests that the Court find that the proposed version of the settlement agreement forwarded to [MAXISIQ] on March 3[rd] (Exhibit E) is enforceable."  (ECF No. 209 at p. 6 n.5.)  MAXISIQ, in turn, argues that because Hurysh's March 3 draft "adds material terms beyond the January 30 email" and "because Hurysh requested the Court enforce his settlement draft over the January 30 [e]mail, the Court should simply deny his Motion."  (ECF No. 228 at pp. 11-12.)  For the reasons set forth herein, the court finds the January 30 email exchange is an enforceable settlement agreement, but the court declines to compel the parties to execute the March 3 draft.  To be clear, the court makes no commentary or finding as to whether that draft does or does not reflect the deal reached on January 30; the court need not, and declines to, reach that issue to conclude that the January 30 email is an enforceable settlement agreement.  Similarly, however, MAXISIQ overstates Hurysh's Motion; the court will not deny the Motion merely because Hurysh contends the March 3 draft fairly represents the deal reached on January 30 and "respectfully requests" that the court consider it.